**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**PENNY M. STEWART**                                            **CIVIL ACTION**

**VERSUS**                                                              **NO. 11-2596**

**SODEXO REMOTE SITE PARTNERSHIP**                   **SECTION "H" (2)**


**ORDER AND REASONS**


        The matter before the Court is Defendant's Motion for Summary Judgment.  (Doc. 40.)  For

the reasons that follow, Defendant's Motion is GRANTED.


**BACKGROUND**

        Plaintiff, Penny Stewart ("Stewart"), began her employment with Defendant, Sodexo

Remote Site Partnership ("Sodexo"), in October, 2008.  Stewart's job with Sodexo required her to

travel throughout the Gulf Coast area.  Stewart began working as a night cook/baker, but was

promoted to Executive Steward.

Stewart's direct supervisor was Crystal Smith ("Smith") who was the Field Manager in charge of facilities operated by BP and Seadrill.  Smith reported to Bill Cooper ("Cooper"), Operations Manager.  Stewart, Smith, and Cooper all worked directly with Sodexo Human Resources, including Senior Human Resources Director Todd Woodruff ("Woodruff") and Employee Relations Manager Nicole Scott ("Scott"), to handle various personnel issues.

At all relevant times, Sodexo had a policy against discrimination and retaliation ("Policy").  The Policy headlines that "Retaliation is Prohibited."  The Policy states that retaliation is taking any adverse action in response to a complaint.  It identifies that "constructive criticism and supervisory actions regarding valid performance or other workplace issues are not retaliation."  The Policy directs an employee who has allegedly been the subject of retaliation to inform "Human Resources or Senior Company Leadership."  The Policy assures that "the allegations will be promptly investigated."  Lastly, if retaliation is found "the person retaliating will be subject to disciplinary action up to and including termination."

When Stewart began her employment in October, 2008 she started on the Shell platform Auger.  It was Stewart's understanding that she was not hired for a specific rig or client, but just hired for her position - e.g. cook or Executive Steward.  After working on the Shell Auger, Stewart was transferred to the BP Nakika and then finally to the BP Mad Dog.

I.    *BP Mad Dog*

In August, 2009 Stewart became the Executive Steward on the BP Mad Dog and began

earning $20.00 an hour.  Approximately seven months after moving to the BP Mad Dog, in May of 2010, Stewart was coached by Operations Manager Cooper on creating a team atmosphere and having improved communications with "Exec."

A.      Chenoweth Complaint and Investigation

In October, 2010 Troy Chenoweth ("Chenoweth"), a steward on the BP Mad Dog, submitted a complaint against Stewart to Cooper and Smith.  Chenoweth listed several reasons for the complaint against Stewart.  In response, Scott investigated Chenoweth's complaint, including conducting employee interviews.  The employee interviews revealed that Stewart did not like Chenoweth.  One employee complained the Stewart lacked leadership skills, was not a team player, and created a low morale amongst her staff.

Upon completion of this investigation, Cooper and Smith met with Stewart on December 8, 2010.  The employee evaluation revealed that Stewart's communication with the crew needed to be addressed and developed, that Stewart needed development in team building, systems, and procedures, and that Stewart needed to improve her communication with Field operations and Senior Operations.  Cooper and Smith decided to relocate Stewart to the BP Atlantis at the same rate of pay and title and send Stewart to additional training.  Stewart attended employee training from December 13, 2010 through December 17, 2010.  Cooper and Smith noted that this would be a fresh start with the client as well as with new employees.

B.     <u>Gender Comment: Email and EEOC Complaint</u>

In an email that Stewart sent to Woodruff on December 10, 2010 Stewart expressed concerns that employees did not take her seriously because she was a woman.  Stewart began by writing that she understood that Human Resources must investigate any and all complaints and that an employer has the right to terminate, relocate, or demote for good cause, bad cause, or no cause at all.  Stewart then went on to state that she received discriminatory advice.  Specifically, Stewart stated that when asked the question "should I compromise with the employee every time they don't get their way," she was given the response "because you are a woman out there, maybe you should ask them, say can we, say please, etc."  Stewart identified this statement as being discriminatory.

Woodruff followed up on Stewart's email by speaking with both Scott and Stewart.  After his conversations with Scott and Stewart, Woodruff believed the situation to be resolved.

In an Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire Stewart signed on February 14, 2011, Stewart identified the December 8th statement as discriminatory.  Stewart attested that she did not feel that Woodruff's conversation with her resolved the issue.  In this same Questionnaire, Stewart identified two instances of alleged retaliation from her complaint about the December 8, 2010 meeting.  Specifically, Stewart alleges that on January 28, 2010 she was the only Executive Steward that was forced to go to a meeting and start following rules derived from another employee.  Stewart also stated that she was treated with disrespect on

a January 20, 2010 site visit from Smith and Elias Villcreal.

II.    *BP Atlantis*

During Stewart's tenure on the BP Atlantis she lodged several complaints.  There are addressed separately.

A.    <u>Flanagan-Hayes Issue</u>

On March 30, 2011 Stewart emailed Cooper and Smith regarding a "personal" issue between her subordinate stewards, Devon Flanagan ("Flanagan") and Rance Hayes ("Hayes").  In Stewart's email she recounted that Flanagan told her to let "ole boy" know that he (Flanagan) left him (Hayes) some beans.  Stewart attested that she requested Flanagan not to use that kind of speech and to refer to other employees by their name.  Flanagan then responded to Stewart that he would have preferred it if she told Hayes to stop telling Flanagan that he (Hayes) was going to slap the white off of his (Flanagan's) face.  Stewart assured Flanagan that she disagreed with that language, did not condone it, and would handle it on the spot if she had heard it.  She further asked Flanagan to notify management the next time a comment like that was made.  Flanagan returned ten minutes later, apologized to Stewart, and stated that he would handle Hayes.  Flanagan further stated that if Hayes said one more word to him he would get violent.  Stewart advised Flanagan that this was not language Sodexo condoned.  Stewart notified Smith and Cooper that this was a personal issue that she did not want to get out of hand.

Smith responded telling Stewart to document the conversation and that threats, whether

direct or indirect, need to be addressed immediately. Smith also contacted Hayes. Hayes informed

Smith that he and Flanagan were playing around that they had worked out the situation without

violence.

      B.    <u>Murphy Issue</u>

On April 5, 2011 Stewart contacted Smith to report a suspicion that Sodexo employee

Donald Murphy ("Murphy") had stolen drugs. Stewart stated that Murphy's behavior had changed

and that some pills were missing from a room.  Smith responded and informed Stewart that she

would forward this information to Sodexo Human Resources.  Smith further advised that Murphy

may be required to submit to a drug screen when he returned onshore.  Stewart responded to

Smith and notified her that Murphy had become belligerent when notified of this decision and was

removed from the platform.  An explanation of the Murphy "Employee Incident" was detailed in

a memorandum prepared by Smith to Scott and Woodruff.

      C.    <u>Flanagan Celtic Cross Issue</u>

On April 23, 2011, Stewart notified Smith and Cooper via of another alleged situation

involving Flanagan.  Stewart recounted that she thought the incident between Flanagan and Hayes

was settled, however "something was still brewing."  Specifically, Stewart stated that there was a

wrapped product of Flanagan's in the refrigerator that displayed a racist hate group symbol on the

wrapping - a celtic cross.  She notified Smith and Cooper that Kevin Powell ("Powell"), with BP,

would be meeting with Flanagan and Hayes that afternoon.  Stewart testified that she had brought

it to Powell's attention first.  Neither Flanagan nor Hayes complained of Flanagan's food wrapping.

Stewart later notified Cooper and Smith that Powell had resolved the "issue" with Flanagan and

Hayes.

        D.     <u>Shanks EEOC Complaint</u>

        On May 5, 2011 Plaintiff filed an EEOC Charge of Discrimination.  Stewart testified that she

believed that her male co-worker, Leo Shanks, was being paid more than her.  She attested that

no reason was given to her about the pay difference.  It is unclear when Sodexo employees

received this Complaint.

        E.     <u>May 2011 Consultation with Stewart</u>

        On May 9, 2011 a consultation was held with Stewart concerning the recent issues with

Murphy, Flanagan, and Hayes.  The consultation sheet memorialized details of the results of an

investigation into the Murphy matter. Specifically, the evaluation stated that the investigation into

the incident revealed inconsistencies between witness statements and Stewart's accusations.  It

noted that Stewart was consulted in December, 2010 in regards to following the chain of command

and limiting communication between her and the client.  Regardless of this training, the Stewart

failed to follow the chain of command in relation to the Flanagan allegations the evaluation stated.

The evaluation highlighted that Stewart had been telling fellow employees that she was unfairly

treated and disclosed information regarding her claim with the EEOC.  The evaluation noted that

Sodexo had continued to see personnel conflicts and lowered morale with the crew.  As a solution,

Stewart would be removed from the BP Atlantis to discuss future placement on another job site and with a new client.  On May 18, 2011 Stewart signed the Employee Consultation and wrote that she "totally disagreed."

Another consultation form was prepared on May 9, 2011.  It stated that Stewart's handling of the Murphy incident was questionable.  The evaluation noted that the allegation of Murphy acting in an aggressive manner towards Stewart was directly contradicted by a witness.  The evaluation further read that Stewart's suspicions were without merit and refuted by drug testing results.  Smith and Cooper stated that her failure to correctly assess and handle the situation and utilize proper communication skills resulted in embarrassment to Murphy.  The evaluation further noted that: (1) there did not appear to be a conflict between Flanagan and Hayes until Stewart intervened; (2) that the write-ups for these employees was unwarranted as there was no racially motivated conduct on behalf of either employee; (3) there was no evidence that either employee displayed any violence or threat of violence warranting a formal write up; (4) that the notification to BP of Flanagan's use of the celtic cross was a failure to follow the proper chain of command thereby depriving Sodexo of the opportunity to investigate the incident; (5) that there was no assessment of the meaning behind the symbol; and (6) Stewart unilaterally decided that the symbol was racially derogatory without any investigation.  The evaluation highlighted that it became apparent from the handling of these matters that: Stewart remained resistant to following Sodexo's chain of command and communicating with team members; personnel conflicts and

-8-

lowered morale persisted under Stewart; and Stewart had failed to implement processes learned in training and coaching resulting in lower morale and client dissatisfaction.  As a result of these findings, Sodexo believed that Stewart could not successfully return to the BP Atlantis and that no further placements on a BP facility were possible.  It further stated that Stewart was being offered the position of the Executive Steward on the Sea Drill at the same rate of pay.  Stewart refused to sign this evaluation on May 18, 2011.

III.    Post BP Atlantis

        Stewart was never placed on the Sea Drill because of client relationship issues.  Scott testified that from the time that Stewart worked on the BP Atlantis until July 28, 2011 there were no jobs available for Stewart's job description and/or her rate of pay.  Scott believed that she did some land-based work, however was not one hundred percent sure.

        On July 28, 2011 Stewart was sent a letter notifying her of an open Executive Steward position on the Shell Perdido.  Sodexo offered Stewart this position and told Stewart that she would need to confirm acceptance by Friday, July 29, 2011.  The letter notified Stewart that if she did not respond to this letter then it would be considered as a refusal of employment and resignation.  The letter detailed that the rate of pay would be $16.50 an hour.

        On August 3, 2011 Sodexo contacted Stewart via letter concerning the Shell Perdido placement.  Sodexo had been notified by Stewart's counsel that she was declining the Shell Perdido assignment.  Sodexo stated that it assumed that the assignment was declined because of the rate

of pay.  After informing her that no hourly rate is guaranteed, they still wanted to offer her at the position, but at her old rate of pay at $20.00 an hour.  The letter further notified Stewart that she had not been terminated by Sodexo and that they had continued to pay for medical and dental insurance throughout the period in which she was not assigned to a rig.  Sodexo confirmed that her employment had remained active as they sought to find another assignment for her as an Executive Steward.  The letter concluded that Stewart must notify Sodexo of acceptance by Monday, August 8, 2011.

On August 16, 2011 Sodexo notified Stewart that they accepted her resignation effective August 9, 2011 because Stewart had not contacted them by August 8, 2011.  Sodexo further notified Stewart that her insurance was effective through August 31, 2011.


## LEGAL STANDARD

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2012). A genuine issue of fact exists only "[i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether the movant is entitled to summary judgment, the Court views facts

in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528(5th Cir.1997). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995). Summary judgment is appropriate if the non-movant "[f]ails to make a showing sufficient to establish the existence of an element essential to that party's case...." *Celotex Corp. v. Catrett*, 477 U.S. 317,324 (1986). "In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial. *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293,301 (5th Cir.2004) (internal citations omitted). "We do not ... in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382,394 (5th Cir.2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069,1075 (5th Cir.1994)). Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." *Boudreaux v. Banctec, Inc.*, 366F.Supp.2d 425, 430 (E.D.La.2005).

**LAW AND DISCUSSION**

Plaintiff waives all claims besides her retaliation claim under Title VII and 28 U.S.C. § 1981. Accordingly, all claims by Plaintiff, with the exception of retaliation, are dismissed with prejudice. The Court now assesses Plaintiff's retaliation claim.  For the following reasons, this Court finds that Plaintiff cannot show a *prima facie* case of retaliation.  Accordingly, Plaintiff's retaliation claims are dismissed.

I.      *Administrative Exhaustion*

A major point of contention for the parties has been whether Plaintiff has administratively exhausted her claims.  This Court is mindful that the Fifth Circuit has consistently held that Title VII claims that have not been exhausted through the administrative process cannot be initiated in federal court. *Fitzgerald v. Sec'y, U.S. Dep't of Veterans Affairs*, 121 F.3d 203, 206 (5th Cir.1997). That being said, the record is unclear as to the status of Plaintiff's EEOC claims.  Neither party carries their burden of showing that the claims either have or have not been administratively handled.  Accordingly, this is an issue to which the Court cannot rule.

Regardless of whether or not Plaintiff has exhausted her administrative remedies, the Court finds that Plaintiff cannot succeed in her retaliation claims against Defendant.  The Court now discusses Plaintiff's retaliation claims.

II.     *Title VII*

Title VII prohibits an employer from discriminating against an employee who has opposed

an employment practice made unlawful under Title VII.  42 U.S.C. § 2000e-3(a).  "To establish a prima facie case of retaliation, the plaintiff must establish that (1) [she] participated in an activity protected by Title VII; (2) [her] employer took an adverse employment action against [her]; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556-7.  Ultimately, summary judgment is appropriate if the plaintiff cannot support all three elements.  *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir. 2001).

     A.     <u>Protected Activity</u>

"Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."  *Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). Stewart alleges that she engaged in several instances of protected activity.  These are each taken in turn.

     1.     **EEOC Charges**

"Filing an EEOC charge is clearly a protected activity."  *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed.App'x 437, 442 (5th Cir. 2007) (citation omitted).  Accordingly, Stewart's EEOC Complaints are clearly protected activities.

     2.     **Complaints to Sodexo Supervisors**

Whether Stewart's notification of her supervisors of the (1) December 8th comment; (2) the Flanagan-Hayes "incident"; (3) Flanagan's celtic cross; and (4) Murphy's alleged drug taking is

-13-

protected activity is much less clear.  The Fifth Circuit has consistently held that an employer must be put on notice, with specificity, of the protected activity in a retaliation claim.  *See Tratree v. BP N. Am. Pipelines, Inc.*, 277 F.App'x 390, 395 (5th Cir.2008) (holding that Plaintiff did not engage in protected activity when he did not put his employer on notice of that he was complaining of the discriminatory treatment as it related to age); *see also Harris–Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir.2006) (affirming summary judgment on retaliation when the Plaintiff failed to show that she complained of racial or sexual harassment, only harassment).

### a.      *December 8th Complaint*

The email sent to Woodruff on December 10, 2010 was clearly enough to put Sodexo on notice that she was complaining of potential discrimination based on her gender.  Stewart plainly states that Scott's "advice" was "discriminatory advice based on my gender."  Accordingly, the Court finds that this is sufficient to constitute protected activity.

### b.      *Flanagan, Hayes, and Murphy Complaints*

On the other hand, the Court finds that Stewart's two complaints about Flanagan and Hayes are not protected activities under Title VII.  "A continuing course of racial harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action."  *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978).  As such, Stewart's opposition to the alleged racial remarks and paraphernalia of her subordinate co-workers is only considered a protected activity if Flanagan's or Hayes' conduct can be attributable to Sodexo.  *See*

*Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 969 (11th Cir. 1997).  Here, no evidence has been presented to show that Scott, Cooper, Woodruff, Smith, or any other Sodexo personnel authorized or approved of Flanagan's or Hayes' remarks or conduct either before or after the incidents.  In fact, the evidence presents quite the opposite.  Accordingly, this Court concludes that Flanagan's and/or Hayes' actions is not attributable to Sodexo.  Because these actions are not attributable to Sodexo, Stewart's resistance to these actions does not constitute opposition to an unlawful employment practice.  As such, these notifications are not considered protected activity within the purview of Title VII.

For similar reasons, the Court finds that Stewart's notifications concerning Murphy are not protected activity either.  Because Stewart does not allege that Murphy committed discrimination, the Court cannot discern what protected activity Stewart would be complaining of.  To the extent that Stewart does make this allegation, the Court finds that her superiors notification cannot be considered protected activity for the same reasons her complaints about Flanagan and Hayes are not recognized as a protected activity under Title VII.

c.      *Complaints to BP*

Lastly, Stewart contends that her report to BP personnel was protected activity, however the Court does not agree.[1]  In support of this contention, Stewart states that the case of *Scarbrough*

---

[1]

Stewart raises this issue for the first time in her opposition to Defendant's Motion for Summary Judgment.  Although this Court has previously declined to address arguments raised for the first

-15-

*v. Board of Trustees of Florida A&M University* assists her.  504 F.3d 1220 (11th Cir. 2007).  In *Scarbrough,* the Court found that a university employee engaged in protected activity when he was personally threatened and physically accosted to campus police.  *Id.* at 1222.  The university employee alleged that he suffered from several months of hostility after his report to campus police. *Id.* at 1221. *Scarbrough* is distinguishable in the following ways: (1) Stewart complained to a non-employer; (2) Stewart was not physically accosted; (3) Stewart did not suffer from months of hostility.

Moreover, to the extent that Stewart argues that she was engaging in an activity protected by the participation clause, this Court cannot agree with this argument.  The participation clause covers participation in an investigation under Title VII.  "This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  It necessarily follows that because no EEOC complaint had been filed in relation to the Flanagan-Hayes or Murphy incident, then Stewart taking part in BP's "internal investigation" does not constitute protected activity under the participation clause of Title VII.

--------

time in an opposition for summary judgment, in an effort for a complete record, the Court will do so in the instant matter.

B.     Adverse Employment Action

The Court must now determine if Sodexo committed an action that was materially adverse to Stewart.  For the following reasons, the Court finds that there was no adverse employment action.

The antiretaliation provision of Title VII "[c]overs those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  "An employment action is not materially adverse if it amounts to only petty slights or minor annoyances that often take place at work and that all employees experience."  *Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 831 (E.D. La. Mar. 15, 2012) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68) (internal quotations omitted).  Indeed, "'adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *Ackel v. Nat'l Commc'n, Inc.*, 339 F.3d 376, 385 (5th Cir.2003) (quoting *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir.2003)).

As an initial matter, the only adverse employment action that Stewart alleges that is cognizable under Title VII is Sodexo's alleged termination.  To the extent that Stewart contends that attending training sessions or was unfairly criticized this is clearly not recognized as adverse employment action.  *See King v. Louisiana*, 294 Fed. App'x 77, 85 (5th Cir. 2008) ("allegations of unpleasant work meetings, verbal reprimands, improper work requests and unfair treatment do

not constitute adverse employment actions as discrimination or retaliation").

Here, Stewart contends that Sodexo terminated her.[2]  The record, however, reveals a different reality.  The evidence clearly shows that Sodexo removed Stewart from the BP Atlantis following several incidents with her co-employees.  After Stewart's removal Sodexo, continued to pay for Stewart's benefits and insurance.  Although Sodexo intended for Stewart to be placed at a different rig expeditiously, this placement  did not work  - namely because Sodexo was having an issue with its client unrelated to Stewart.  Sodexo apprised Stewart that they were continuing looking for another position for her at her same rate of pay and title because Stewart refused to accept a position at either a lower pay or performing cooking activities.  Approximately two and a half months later, Sodexo notified Stewart that they had another position for her at a lower rate of pay.  The record reveals that this was the first available position that comported with Stewart's requested pay rate and title.  Stewart declined this position.  Sodexo followed up stating that they would offer her at the same rate of pay as her prior position.  Stewart did not respond, thereby tendering her resignation. Based on the foregoing, the only potentially adverse employment action was Stewart's two month sabbatical from rig work.

"An employer taking an adverse employment action against an employee, including a suspension without pay, only risks Title VII liability if there exists sufficient evidence to prove that

---

[2]Plaintiff's counsel contends that constructive discharge is not at issue because Stewart was terminated.  Accordingly, those arguments will not be addressed.

the employer took the action based upon illegal discrimination." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004). There is no evidence in the record to show that Sodexo's actions were taken based upon illegal discrimination. It is evident, however, that Sodexo was ready to place Stewart at the earliest possible time on another rig. Significantly, Stewart refused to tend to any job that would have her cooking, even if it was at the same rate of pay. The Court finds that these actions by Sodexo would not be reasonably adverse to a reasonable employee, in particular because it is unlikely that a reasonable employee would forego temporary work while waiting for permanent placement.

Ultimately, because Plaintiff fails to demonstrate that the employer's actions could be materially adverse to a reasonable employee, she cannot meet the second element required to prove a *prima facie* retaliation claim. Accordingly, Plaintiff's retaliation claim is be dismissed.

C.     Causal Connection

Although the Court finds that there was no adverse employment action taken, the Court also assesses the third required element of a retaliation claim. Thus, even if there were to be an adverse employment action on behalf of Sodexo, this Court finds that there is no causal connection between the protected activity that Stewart engaged in and Sodexo's alleged adverse employment action. As such, Stewart's retaliation claim fails.

"A 'causal link' is established when the evidence shows that the employer's decision to terminate was based in part on knowledge of the employee's activity." *Tryals v. Altairstrickland,*

*LP*, No. H-08-3653, 2010 WL 743917, at *11 (S.D. Tex. Feb. 26, 2010) (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).  In evaluating the claimed causal connection, this Court may look to (1) the employee's past disciplinary record, (2) whether the employer  followed a policy in penalizing the employee, and (3) the temporal proximity between the employee's protected activity and the employer's adverse actions. *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (citing *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)).  This Court finds that these three factors do not reveal a causal connection.

Stewart was released from the BP Atlantis after several instances of documented insubordinate behavior, issues with her co-workers, and failures to follow Sodexo protocol. The only protected activity engaged in by Stewart was her EEOC Complaints, one of which was dated after her removal from the BP Atlantis, and her email to Woodruff.  This was done approximately five months and three months prior to her removal from the BP Atlantis.   Several instances of improper employee behavior occurred during this three to five month time period.  In addition to the issues detailed during this time period, prior to Stewart's tenure on the BP Atlantis, Sodexo had issues with Stewart's performance that warranted removal from another rig.  In relation to these previous issues, supervisors met with Stewart to discuss company procedures, institute training plans, and make accommodations for Stewart's benefit.  The evaluations of Stewart clearly reveal that despite these attempts, she rebuffed training techniques and company protocol.

The year of evaluations, necessary transfer to a different employment site, training

sessions, and discussions with supervisors show that the connection between any of Plaintiff's complaints and her removal from the BP Atlantis to be tenuous at best. Accordingly, the Court finds that there is a lack of a causal connection between the protected activity and the alleged adverse employment discrimination.

        D.     <u>*Nassar*</u>

This Court further highlights the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar.* The *Nassar* court held that a Title VII retaliation claim "[m]ust be proved according to traditional principles of but-for causation" and not the lesser test used for status-based discrimination. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2532 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* As such, "[a] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but for cause of the alleged adverse action by the employer." *Id.* at 2533.

The *Nassar* decision buttresses the finding that Stewart's retaliation claim fails. There is no evidence in the record that shows that "but for" Stewart's email to Woodruff and/or her two EEOC Complaints she would have been removed from the BP Atlantis. Indeed, the record clearly indicates that she was removed after a series of issues with her co-workers, inability to follow company policies, and a low morale amongst her subordinates. Accordingly, Stewart fails at meeting her burden of showing that her protected activity was a but for cause of any adverse

action made by Sodexo.

III.     Section 1981

    "To prove a prima facie retaliation case under Section 1981, a plaintiff must show: (1) that

he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) that

a causal connection exists between the protected activity and the adverse employment action."

*Mitchell v. Crescent River Port Pilots Ass'n*, 515 F.Supp.2d 666, 680 (E.D. La. 2007) *aff'd*, 265 F. App'x

363 (5th Cir. 2008) (citing *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir.2000)).

Under Section 1981, "the ultimate determination is whether, 'but for' the protected conduct, the

employer would not have engaged in the adverse employment action."  *Id.* (citing *Douglas v.*

*DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998)).   Because of the

Court's reasoning for Stewart's Title VII, this Court finds that her Section 1981 claim necessarily

fails.  Accordingly, this claim is dismissed.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 40) is GRANTED and all of Plaintiff's claims are DISMISSED.

Judgment shall be entered in accordance with this Order.

New Orleans, Louisiana on this 23rd day of August, 2013.


_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT COURT JUDGE**